IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

COLLIN J. HAINES,              *
                              *
     Plaintiff,                *
                              *
vs.                            *      Civil Action No. 03-0695-P-B
                              *
JO ANNE B. BARNHART,           *
Commissioner of                *
Social Security,               *
                              *
     Defendant.                *

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for Social Security disability insurance benefits.  This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  Oral argument was held on December 14, 2004. Upon consideration of the administrative record, oral argument and the memoranda of the parties, it is recommended that the decision of the Commissioner be **REVERSED** and **REMANDED.**

## I.   Procedural History

Plaintiff, Collin J. Haines, filed an application for disability insurance benefits on November 10, 1998 alleging that he has been disabled since August 31, 1998 due to seizures and numbness in his hands and feet.   (Tr. 105-107, 266).

Plaintiff's application was initially denied on February 5, 1999, and upon reconsideration on April 7, 1999. (Tr. 82-86, 87-88, 89-90). Plaintiff filed a Request for Hearing on June 15, 1999, and thereafter, on December 2, 1999, Administrative Law Judge (ALJ) James D. Smith conducted a hearing, which was attended by Plaintiff. (Tr. 91-92, 39-47).[1] On April 20, 2000, ALJ Smith entered a partially favorable decision wherein he found Plaintiff disabled for a closed period of disability from August 31, 1998 through March 1, 2000. (Tr. 240-245). Plaintiff requested review of the ALJ's decision, and on March 21, 2002, the Appeals Council affirmed the ALJ's finding of disability, but remanded the matter to the ALJ to address issues relating to medical improvement. (Tr. 246-247, 248-250). Upon remand, a supplemental hearing was conducted on July 23, 2002. (Tr. 55-74). On March 14, 2003, the ALJ entered a decision wherein he found that, as of March 1, 2000, Plaintiff had the severe impairments of lumbar degenerative disc disease, degenerative joint disease of the knees, neurofibromatosis,[2] and

---

[1]

A supplemental hearing was held on April 11, 2000 to discuss Plaintiff's employment since his alleged onset of disability. (Tr. 48-54).

[2]

"A genetic disease characterized by pigmented skin lesions and multiple skin neurofibromas, and sometimes accompanied by physical deformity and a predisposition to brain tumors and various forms of cancer." *The American Heritage Stedman's Medical Dictionary* (2002), p. 554.

2

a history of left frontal low-grade glioma[3] (status post resection).  (Tr. 16-31).  The ALJ further determined that Plaintiff was capable of performing work which exists in significant numbers in the national economy.  (Tr. 29, 31).  On August 15, 2003, Plaintiff's request for review was denied by the Appeals Council thus making the ALJ's decision the final decision of the Commissioner of Social Security.  (Tr. 6-10). The parties agree that this case is now ripe for review and is properly before this Court pursuant to 42 U.S.C. § 405(g).

## II.  **Background Facts**

Plaintiff was born December 17, 1961 and was forty years old at the time of the administrative hearing on July 23, 2002. (Tr. 60).  Plaintiff has a twelfth grade education and past relevant work experience as a pipe fitter, welder helper and yard worker.  (Tr. 28, 267, 272, 280-287, 333-338, 359). According to Plaintiff, he became unable to work on August 31, 1998 because of seizures and numbness in his hands and feet. (Tr. 105-107, 266).  In September 1998, Plaintiff underwent left frontal craniotonmy surgery for the removal of a tumor.  (Tr. 166).  Plaintiff testified that in March, 2000, he began working as a security guard, approximately thirty-six (36) hours a week.

---

[3] "A tumor that originates in the neuroglia of the brain or spinal cord." *The American Heritage Stedman's Medical Dictionary* (2002), p. 336.

(Tr. 52-53).  His job duties as a security guard entailed riding around the property in a golf cart patrolling the parking lot, and closing 6-foot tall, 30-foot long, gates at closing.  (Tr. 53, 61).  According to Plaintiff, he worked as a security guard until May, 2000, when he quit because of pain in his shoulders and back from closing the gates.  (Tr. 61, 69-70).  At the administrative hearing on April 11, 2000, Plaintiff also testified that he did yard work for a church.  (Tr. 51-52).  At the administrative hearing on July 23, 2002, Plaintiff testified that he still worked at the church doing housekeeping chores, approximately forty-five (45) minutes a week during 2002, and an average of approximately two (2) hours each week in 2001.  (Tr. 70-72).

Plaintiff testified that he had not experienced a seizure from December 1999 through April 2000, or sought medical treatment during that time.  (Tr. 51).  At the time of administrative hearing on July 23, 2002, Plaintiff testified that he had not had a seizure in over a year, and that he had not seen a doctor regarding his seizures since 1998.  (Tr. 42, 61-62).  Plaintiff further testified that in February, 2002, he had outpatient surgery on his knee to repair torn cartilage.  (Tr. 62, 68).  As a result of his neurofibromatosis, Plaintiff testified that he has growths on different parts of his body

4

that ache and cause him problems.  (Tr. 65).  Plaintiff further testified that he had a growth removed from his back in October, 2001, and from his right foot in November, 2001.  (Tr. 62-63, 421-422, 450).  Plaintiff also testified that he is unable to work because of pain and stiffness in his knees, legs and lower back.  (Tr. 63, 66-67, 69).  Plaintiff further testified that he is in constant pain and is unable to bend over, stand, kneel, or sit for long periods of time because of pain.  Id.  Plaintiff also testified that he experiences numbness in his left hand and left foot.  (Tr. 66).  Additionally, Plaintiff testified that he has arthritis in his knees and lower back that causes him to experience stiffness and sharp pains on a daily basis.  (Tr. 68).  Plaintiff testified that his pain medications include Lortab, Hydrocortisone, Tylenol, Celebrex, and epidural or Cortisone shots[4], but that the medication only numbs the pain before it returns again.  (Tr. 63-64, 67-68).

The ALJ determined that Plaintiff has not engaged in substantial gainful activity since March 2000.  (Tr. 23, 30).  The ALJ further determined that Plaintiff has the severe impairments of lumbar degenerative disc disease, degenerative

---

[4]

At the time of the administrative hearing on July 23, 2002, Plaintiff testified that he had three (3) or four (4) epidural or Cortisone shots in his knee that year.  (Tr. 64).

joint disease of the knees, neurofibromatosis and a history of left frontal low-grade glioma (status post resection). (Tr. 23, 30). The ALJ concluded that Plaintiff does not have an impairment or combination of impairments which meet or equal the criteria for any of the impairments listed in 20 C.F.R. § 404, App. 1, Subpt. P. <u>Id.</u> Next, the ALJ determined that there has been improvement in Plaintiff's impairments, and that such improvement is related to Plaintiff's ability to work, and that no exception to the medical improvement standard applies. (Tr. 23-28, 30). The ALJ also found Plaintiff's allegations regarding symptomatology, functional limitations and restrictions of daily living activities lacked corroboration or substantiation in the medical evidence and were not credible as to a disabling impairment. (Tr. 26-27, 30). The ALJ determined that Plaintiff has the residual functional capacity to perform light work activity, and could not return to his past relevant work. (Tr. 28-31). Based on the Medical-Vocational Guidelines, exertional capacity for light work, Plaintiff's age, education, and work experience, the ALJ concluded that Plaintiff is not disabled and is capable of performing work that exists in significant numbers in the national economy. (Tr. 29-31).

**III. <u>Issues on Appeal</u>**

1. Whether the ALJ erred in finding that Plaintiff retains

the residual functional capacity to perform a wide range of light work?

2.    Whether the ALJ erred in evaluating Plaintiff's testimony?

3.  Whether the ALJ erred in evaluating the impact of Plaintiff's combination of impairments on his ability to work?

**IV.      Analysis**

**A.   Standard of Review**

In reviewing claims brought under the Act, this court's role is a limited one.  The court's review is limited to determining: 1) whether the decision of the Secretary is supported by substantial evidence, and 2) whether the correct legal standards were applied.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[5]  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)(Substantial evidence is defined as "more than a scintilla but less than a preponderance," and

---

5

This court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

7

consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. Dist. Lexis 10163 (S.D. Ala.).

**B.   <u>Discussion</u>**

After a claimant has been awarded disability benefits, the Commissioner is statutorily required to periodically review whether entitlement to receive benefits continues. 20 C.F.R. § 404.1594(a). When a claimant presents evidence of continuing disability, a presumption attaches that the disability continues, until proven otherwise. <u>Simpson v. Schweiker</u>, 691 F.2d 966, 969 (11th Cir. 1982) ("However, it is also certain, as the Fifth Circuit declared in <u>Rivas v. Weinberger</u>, 475 F.2d 255 (5th Cir. 1973),[6] that '(o)nce evidence has been presented which supports a finding that a given condition exists it is presumed in absence of proof to the contrary that the condition has remained unchanged.'"). Therefore, the burden is upon the

---

[6]

Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent on the Eleventh Circuit. <u>Bonner v. City of Prichard, Alabama</u>, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

Commissioner to present evidence to support the decision to terminate disability income benefits or supplemental security income.[7]

In reviewing a decision to terminate benefits, the ALJ must compare the original medical evidence to the new medical evidence used to make a finding of medical improvement. Williams v Apfel, 73 F. Supp. 2d 1325, 1337-1338 (M.D. Fla. 1999), citing Vaughn v. Heckler, 727 F.2d 1040, 1043 (11th Cir. 1984). The comparison begins with the "most recent favorable medical decision, that is, the latest final decision involving consideration of the medical evidence and the issue of whether claimant was disabled or continued to be disabled." Id., see 20 C.F.R. § 404.1594(b)(7); 20 C.F.R. § 416.994(b)(1)(C)(vii). Review of the medical signs, the claimant's statements of his or her symptoms and complaints, and laboratory findings is necessary to determine whether medical improvement has occurred.

---

[7]

"[O]nce the claimant has introduced evidence that his or her condition remains essentially the same as it was at the time of the earlier determination, the claimant is entitled to the benefit of a presumption that his or her condition remains disabling.... The presumption of a continuing disability does not affect the ultimate burden of proof. It imposes on the [Commissioner] only the burden of going forward with evidence to rebut or meet the presumption..... Once the burden to come forward has shifted to the SSA, the [Commissioner] must present evidence that there has been sufficient improvement in the claimant's condition to allow the claimant to undertake gainful activity." Williams v. Apfel, 73 F. Supp 2d 1325, 1337 (M.D. Fla. 1999), quoting Daring v. Heckler, 727 F.2d 64, 68-69 (3d Cir.1984).

<u>Id.</u>, <u>see</u> 20 C.F.R. § 404.1594(b)(1); 20 C.F.R. § 416.994(b)(1)(I). Also, the medical improvement must be related to the claimant's ability to work, which means that along with the decrease in severity of the claimant's medical impairment, there has been an increase in the claimant's "residual functional capacity to do basic work activities." 20 C.F.R. § 404.1594(b)(3); 20 C.F.R. § 419.994(b)(1)(iv)(A).

There must also be a showing that the claimant is able to engage in substantial gainful activity. 20 C.F.R. § 404.1594(b)(5); 20 C.F.R. § 419.994(b)(1)(v). The regulations state that "[w]hen new evidence showing a change in signs, symptoms and laboratory findings establishes that both medical improvement has occurred and [the claimant's] functional capacity to perform basic work activities, or residual functional capacity, has increased, we say that medical improvement which is related to [the claimant's] ability to work has occurred." 20 C.F.R. § 404.1594(b)(4)(I);[8] <u>See also</u> 20 C.F.R. § 416.994(b)(2).

In a disability insurance benefits case, the regulations

---

[8]

There are exceptions to the requirement of a finding of medical improvement, which are not applicable here, that may also result in the termination of disability benefits. 20 C.F.R. § 404.1594(d) and (e).

require the Commissioner to follow an eight-step[9] sequential evaluation process to determine whether a claimant has obtained medical improvement. 20 C.F.R. § 404.1594(f).[10]  In the case *sub judice*, the ALJ applied the usual eight-step process for evaluating medical improvement in disability claims, and found that Plaintiff has not engaged in substantial gainful activity since his alleged onset of disability, and that he suffers from

---

[9]

In cases wherein the plaintiff previously received supplemental security income benefits, there is a seven-step process. 20 C.F.R. § 416.994(b)(5).

[10]

The steps are as follows:
1) Whether the claimant is engaging in substantial gainful activity.
2) Whether the claimant has an impairment or combination of impairments which meets or equals the severity of an impairment in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1.
3) If not, then whether the claimant has obtained medical improvement as defined in paragraph (b)(1) of 20 C.F.R. § 404.1594.
4) If the claimant has obtained medical improvement, is it related to his or her ability to perform work; i.e., has there been an "increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination."
5) If no medical improvement was found at step three or if medical improvement was found at step four but it did not increase the claimant's residual functional capacity, then the Commissioner must consider whether any of the exceptions listed in paragraphs (d) and (e) of 20 C.F.R. § 404.1594 apply.
6) If medical improvement is related to the ability to work, or if one of the exceptions from paragraph (d) apply, the Commissioner must determine whether all the claimant's current impairments are severe.  If not, then the disability will terminate.
7) If the claimant has current severe impairment(s), then the Commissioner must assess the claimant's residual functional capacity, and if the claimant can still perform his or her past relevant work, then he or she will be found not disabled, and the disability will terminate.
8) If the claimant cannot perform past relevant work, then the Commissioner must determine whether the claimant can perform other work.  To do so, the Commissioner must assess the claimant's residual functional capacity, age, education, and past work experience. If the claimant can perform other work, then the disability will cease.
20 C.F.R. § 404.1594(f)(1) through (8).

11

lumbar degenerative disc disease, degenerative joint disease of the knees, neurofibromatosis and a history of left frontal low-grade glioma (status post resection).  (Tr. 23, 30).  Then, as noted *supra*, the ALJ found that these impairments, when considered individually, or in combination, do not meet or equal the criteria listed in 20 C.F.R.  Pt. 404, Subpt. P., App. 1. Id.  Next, the ALJ determined that there has been improvement in Plaintiff's impairments, that such improvement is related to Plaintiff's ability to work, and that no exception to the medical improvement standard applies.  (Tr. 23-28, 30).  The ALJ further determined that Plaintiff's allegations regarding symptomatology, functional limitations and restrictions of daily living activities lacked corroboration or substantiation in the medical evidence and were not credible as to a disabling impairment.  (Tr. 26-27, 30).  Proceeding to the seventh step, the ALJ determined that Plaintiff has the residual functional capacity to perform light work activity, but is unable to return to his past relevant work.  (Tr. 28-31).  At step eight, the ALJ concluded that Plaintiff is capable of performing other work that exists in the national economy, and is not disabled.  (Tr. 29-31).

Plaintiff argues that the ALJ's determination that Plaintiff

is capable for performing a wide range of light work[11] is not supported by substantial evidence. Specifically, Plaintiff argues that the medical evidence indicates that he suffers from anxiety, depression, severe lumbar degenerative disease, degenerative joint disease of the knees, neurofibromatosis, numbness to the right upper extremity and left leg, a history of left frontal low grade glioma (status post resection), seizure

---

[11]

Light work is defined as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit long periods of time.

20 C.F.R. § 404.1567(b) (2001); 20 C.F.R. § 416.967(b) (2001). Light exertional work is further explained in Social Security Ruling 83-10, Titles II and XVI: Determining Capability To Do Other Work - The Medical-Vocational Rules of Appendix 2, 1983 WL 31251 at *5-6, which sets forth as follows:

"Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on ones feet up to two-thirds of a work day, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour work day. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of fingers for fine activities to the extent required in much sedentary work.

disorder and severe non-exertional impairments such as pain. Plaintiff further avers that medical evidence indicates that Plaintiff: can only sit, stand and walk for one (1) hour at a time; should never lift/carry more than five (5) pounds; can occasionally bend; and never squat, crawl, or climb. To that end, Plaintiff argues that the ALJ failed to indicate what specific jobs Plaintiff could perform with his alleged impairments and limitations.

The determination of a plaintiff's residual functional capacity is an administrative finding reserved to the Commissioner, which must be based upon all the relevant evidence such as objective medical evidence, medical acceptable signs and clinical findings, effects of treatment, medical source statements, plaintiff's testimony and reports of daily activities. 20 C.F.R. § 404.1245(a); 20 C. F.R. § 416.945(a); Social Security Ruling 96-8p: <u>Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims</u>, 1996 WL 374184. Medical source statements such as physical capacities evaluations are medical evidence and must be considered by the ALJ.[12]   However, as with any medical evidence, a physical

---

[12] A consultative examination report should contain certain information as listed in the regulations which set forth, in pertinent part, as follows: "(6) A statement about what you can still do despite your impairment(s), unless the claim is based on statutory blindness. This statement should describe the opinion of the medical source about your ability, despite your impairment(s), to do work-

capacities evaluation can be rejected if it is inconsistent with the physician's notes and other objective medical or clinical evidence in record. The ALJ may also reject the opinion regarding a plaintiff's physical capacities when the evidence supports a contrary conclusion or when the opinion is contrary to other statements or reports of the physician. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159-1160 (11th Cir. 2004) (finding that the physician's opinion that claimant is permanently and totally disabled is inconsistent with his own treatment notes, unsupported by medical evidence and based primarily on the claimant's subjective complaints of pain); Phillips v Barnhart, 357 F. 3d 1232, 1240-1241 (11th Cir. 2004) (good cause exists for not giving treating physician's opinion substantial weight when the opinion is not bolstered by the evidence; the evidence supports a contrary finding; or the opinion is conclusory or inconsistent with the doctor's own medical records).

Furthermore, Social Security Ruling 96-5p Title II and XVI:

related activities, such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling; and, in cases of mental impairment(s), the opinion of the medical source about your ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers and work pressures in a work setting. Although we will ordinarily request, as part of the consultative examination process, a medical source statement about what you can still do despite your impairment(s), the absence of such a statement in a consultative examination report will not make the report incomplete." 20 C. F. R. § 404.1527; 20 C.F.R. § 404.1519n; 20 C.F.R. § 416.919n.

Medical Source Opinions on Issue Reserved to the Commissioner,
1996 WL 374183, in the section entitled "Residual Functional
Capacity Assessments and Medical Source Statements" sets forth
as follows:

> The regulations describe two distinct kinds of
> assessments of what an individual can do despite the
> presence of a severe impairment(s). The first is
> described in 20 CFR 404.1513(b) and (c) and 416.913(b)
> and (c) as a "statement about what you can still do
> despite your impairment(s)" made by an individual's
> medical source and based on that source's own medical
> findings. This "medical source statement" is an
> opinion submitted by a medical source as part of a
> medical report. The second category of assessments is
> the RFC assessment described in 20 CFR 404.1545,
> 404.1546, 416.945, and 416.946 which is the
> adjudicator's ultimate finding of "what you can still
> do despite your limitations." Even though the
> adjudicator's RFC assessment may adopt the opinions in
> a medical source statement, they are not the same
> thing: A medical source statement is evidence that is
> submitted to SSA by an individual's medical source
> reflecting the source's opinion based on his or her
> own knowledge, while an RFC assessment is the
> adjudicator's ultimate finding based on a
> consideration of this opinion and all the other
> evidence in the case record about what an individual
> can do despite his or her impairment(s).

1996 WL 374183 at *6.

In making his determination regarding Plaintiff's residual
functional capacity, the ALJ observed that Plaintiff sought very
little medical treatment for his alleged symptoms after March

2000, and was able to do "odd jobs".[13]  (Tr. 23, 26).  The ALJ
further noted that, based upon a consultative examination of
Plaintiff on February 19, 2001, Dr. John W. Lowery, M.D. noted
that Plaintiff reported that he was not on any medication for
his alleged back, foot, hand and knee pain, and that he had not
had a seizure in two (2) years.  (Tr. 23, 402).  Dr. Lowery also
found Plaintiff's lungs to be clear; heart rate regular and
without murmur; no signs of abdominal mass; "moderate"
tenderness in his right lower thoracic spine area; no sign of
diminished range of motion, except in index finger; fair
tenderness in knees; Plaintiff was capable of walking without
assistance, his gait was normal and he could walk on his heels
and toes, squat and rise; peripheral pulses were intact;
neurological functioning was appropriate; and that he had
"marked extremely numerous soft tissue tumors which are
extensive, large and scattered throughout his entire body".
(Tr. 402-403).  Dr. Lowery listed his impressions as:
neurofibromatosis, status post surgery for brain tumor, back
pain with history of epidural injections, arthritis of the knees
and possible arthritis in his hands.  (Tr. 24, 403).

---

13

The ALJ noted that although Plaintiff's earnings did not constitute
substantial gainful activity (Tr. 260, 264), Plaintiff's ability to perform odd
jobs evidenced a desire and ability to perform work activity.  (Tr. 26).

The ALJ noted that Plaintiff also sought treatment from orthopedist, Dr. Thomas R. Dempsey, on October 8, 2001, who indicated that he had not examined Plaintiff since October, 1999. (Tr. 24, 451). Upon examination of Plaintiff, Dr. Dempsey found that Plaintiff had: 50% range of motion in his back; paraspinous muscle spasms; and neurofibromas over his back. Like Dr. Lowery, Dr. Dempsey diagnosed Plaintiff with neurofibromatosis, low back pain, and knee pain. (Tr. 451-452[14]). Dr. Dempsey prescribed medication for Plaintiff and recommended that he undergo diagnostic studies and epidural, of which Plaintiff underwent epidural injections in November and December of 2001 on three (3) separate occasions. (Tr. 24, 447-449). Additionally, Plaintiff underwent surgery on October 30, 2001 to remove a neurofibroma from his back. (Tr. 421-422).

The ALJ further noted that subsequent MRIs, on October 11, 2001, revealed that Plaintiff suffered from degenerative disc disease in the lumbosacral spine and subchondral cystic changes in his right foot. (Tr. 24, 419-420). Additionally, X-rays of Plaintiff's knees showed mild patellofemoral arthritis in both knees, and MRIs performed on both knees on January 21, 2002, revealed "moderate sized undersurface tear of the posterior horn and of the medial meniscus" and "[h]yaline thinning" at the

---

[14]Some of Dr. Dempsey's notes are not legible.

medial femorotibial articulation. (Tr. 25, 423-424). Plaintiff underwent surgery on his right knee on February 5, 2002. (Tr. 25, 436-437). The ALJ observed that treatment records of subsequent examinations of Plaintiff by Dr. Dempsey indicate a decrease in Plaintiff's pain and improvement in Plaintiff's strength and range of motion in his right knee. (Tr. 25, 27, 425-435). During his last documented examination of Plaintiff on June 26, 2002, Dr. Dempsey noted that Plaintiff had: full extension and flexion motion in the knee; full lumbar range of motion; normal knee/ankle reflexes; and no muscular atrophy and no lower extremity weakness. The notes also reflect that Plaintiff's right knee had 1+ effusion and his back showed pain on percussion over both posterior superior iliac crests with grade I paraspinous muscle spasms. (Tr. 26, 438).

The ALJ also relied upon Plaintiff's reported daily activities as support for his findings regarding Plaintiff's residual functional capacity to perform light work. Specifically, the ALJ observed that Plaintiff is able to care for his personal needs, cook, shop for his personal needs, perform household chores, attend church, drive, and leave home eight (8) to nine (9) times per week. (Tr. 27, 275-279, 302-306, 346-349). Additionally, the ALJ noted that Plaintiff's alleged pain did not affect his ability to answer questions or

19

remember facts at the administrative hearing, and he had not been referred to a pain clinic, and had not had surgery on his back. (Tr. 27, 55-74).

While the record evidence does reflect that as of March 2000, Plaintiff has shown medical improvement in that he recovered from his brain tumor, his seizure activity has ceased, and he went a sustained period of time without receiving medical treatment or taking medication, the undersigned concludes, based on the totality of the evidence, that the ALJ's decision that Plaintiff retains the residual functional capacity to perform light duty work is not supported by substantial evidence. The record reflects that from 2001 forward, Plaintiff has consistently complained of low back pain, and pain in his knees, and that there is objective medical evidence of an underlying condition. Both of Plaintiff's treating physicians, Dr. Dempsey and Dr. Cecil Parker, as well as the consultative doctor, have diagnosed Plaintiff with neurofibromatosis, low back pain and knee pains. Additionally, MRIs revealed degenerative disc disease in Plaintiff's lumbosacral spine and "moderate sized undersurface tear of the posterior horn and of the medial meniscus" and "[h]yaline thinning" at the medial femorotibial articulation in the Plaintiff's knees. (Tr. 25, 423-424).

Dr. Dempsey's treatment plan for Plaintiff included epidural

injections in November 2001 and December 2001, right knee
surgery, physical therapy and medication, including Lortab for
pain. While it appears that this treatment provided Plaintiff
some relief, Dr. Dempsey and Dr. Parker's treatment notes
reflect that even after the surgery and physical therapy,
Plaintiff continued to complain about pain in his left knee and
his lower back, and was prescribed medication, including Lortab
for pain. (Tr. 228-232, 425-435, 436-452, 453-459).

In an assessment dated June 26, 2002, Dr. Parker opined that
Plaintiff can only sit, stand and walk for one (1) hour during
an eight-hour day; should never lift/carry more than ten (10)
pounds; can occasionally bend; and never squat, crawl, or climb.
(Tr. 418). The ALJ, however, did not afford Dr. Parker's
opinion determinative weight, as he concluded that the opinion
was not justified and was inconsistent with Dr. Parker's
treatment records and the record as whole. (Tr. 29-30). Aside
from Dr. Parker's assessment, the only other medical evidence in
the record which addresses the effect of Plaintiff's conditions
on his ability to work is the Physical Residual Functional
Evaluation that was completed by the State agency physician in
March 2001. In the assessment, the agency physician opined that
Plaintiff could: occasionally lift/carry twenty (20) pounds, and
frequently lift/carry ten (10) pounds; stand/walk six (6) hours

during an eight-hour workday; sit six (6) hours during an eight-hour workday; occasionally climb, stoop, kneel, crouch and crawl; and frequently balance. (Tr. 406-414). This assessment, which was not referenced by the ALJ, cannot constitute substantial evidence for the ALL's decision because it was completed in March 2001; thus, it obviously does not take into account Dr. Dempsey's medical records which reflect treatment of Plaintiff for knee and back pain from November 2001 through the June 2002 time frame, nor the treatment records of Dr. Parker.

Accordingly, while the totality of the evidence reflects that Plaintiff has problems with his back and right leg, what the record does not clearly establish is the effect that these conditions have on Plaintiff's ability to work. Thus, the record lacks substantial evidence to support the ALJ's finding that Plaintiff can perform light work[15]. <u>Manso-Pizarro v. Secretary of Health and Human Services</u>, 76 F.3d 15 (lst Cir. 1996)(where the ALJ's conclusion that the plaintiff can continue to do her prior medium-level work is not supported by substantial evidence,

---

[15]While the ALJ makes much of Plaintiff's reported daily activities and the fact that Plaintiff performed odd jobs, the undersigned finds that such is not compelling. This is particularly true given Plaintiff's testimony that since his brain surgery, he has tried trial periods of work; however, due to his back and leg pains, he has been unable to maintain gainful employment. According to Plaintiff, because of his pain, he left a security job after a little over two months, and he was only able to work at a church doing housekeeping chores, approximately forty-five (45) minutes a week during 2002, and an average of approximately two (2) hours each week in 2001. (Tr. 70-72).

case remanded to the secretary for additional evidence of functional ability.); Hernadez v. Barnhart, 203 F. Supp. 2d 1341 (S.D. Fla. 2002)(case should be remanded in order for the examining consultants to render their opinion as to the plaintiff's functional capacity); Rohrberg v. Apel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998) (stating that when the medical findings merely diagnose the claimant's impairments and do not relate the impairments to specific residual functional capabilities such as those set out in 20 C.F.R. §404, 1567(a), the Commissioner may not make that connection himself). Therefore, the undersigned recommends that this matter be reversed and remanded for further proceedings to determine Plaintiff's residual functional capacity to work, as of March 2000. Thereafter, if required, the ALL shall proceed to the remaining steps in the sequential analysis. To the extent it is determined that Plaintiff is unable to perform a full range of work at a given functional level or that he has both exertional and nonexertional limitations, a vocational expert should be utilized. Welch v. Bowen, 854 F.2d 436, 439-440 (11th Cir. 1988); Adams v. Apel, 1999 U.S. Dist. Lexis 6595 (S.D. Ala. 199)(preferred method of demonstrating job availability where the plaintiff is unable to perform a full range of work at a given functional level or has both exertional and nonexertional

limitations is through the testimony of a vocational expert.)

**V.** __Conclusion__

For the reasons set forth, and upon consideration of the administrative record, oral argument and the memoranda of the parties, it is recommended that the decision of the Commissioner of Social Security denying Plaintiff's claim for disability insurance benefits, as of March, 2000, be **REVERSED** and **REMANDED** for further proceedings consistent with the undersigned findings. The attached sheet contains important information regarding objections to this __report and recommendation.__

**DONE** this **3rd** day of **March**, **2005**.

                    __s/ SONJA F. BIVINS__
                 **UNITED STATES MAGISTRATE JUDGE**

### MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.   **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(c); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection. Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **Transcript (applicable where proceedings tape recorded)**. Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

                    **s / SONJA F. BIVINS**
                    **UNITED STATES MAGISTRATE JUDGE**